IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 14-00256-01-CR-W-RK |
| JAMES A. CROCKETT, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence seized during three

separate occasions on the grounds that (1) police lacked probable cause to arrest

defendant and search his vehicle on February 2, 2012; (2) police lacked probable

cause to stop defendant's vehicle on February 9, 2013; and (3) the inventory search on

May 31, 2014, was not done pursuant to police tow policy.  I find that (1) police

conducted a lawful Terry stop on February 2, 2012, and the search of the vehicle was

proper; (2) the stop on February 9, 2013, was lawful because defendant was

committing a traffic violation, and the subsequent search of the car was lawful; and (3)

defendant lacks standing to challenge the search that occurred on May 31, 2014.

Therefore, defendant's motion to suppress should be denied.

*I.*     *BACKGROUND*

On February 2, 2012, officers were investigating a report of a prowler and

encountered defendant and another man sitting in a car.  Upon approaching the car,

officers detected the odor of marijuana coming from the car.  The passenger was

arrested pursuant to an outstanding warrant, and defendant was removed from the car

so that it could be searched for marijuana. He fled from police but was subsequently apprehended. Police found a backpack containing illegal drugs as well as a magazine with .40 caliber ammunition in the car. The original indictment in this case was returned on September 19, 2014, and charges defendant with seven counts based on that incident:

1.    Possession with intent to distribute cocaine base.

2.    Possession with intent to distribute PCP.

3.    Possession with intent to distribute cocaine.

4.    Possession with intent to distribute Oxycodone.

5.    Possession with intent to distribute Oxymorphone.

6.    Possession with intent to distribute marijuana.

7.    Possession of ammunition after having been convicted of a felony.

On February 9, 2013, defendant's car was stopped because of a broken taillight which the officer believed was a violation of state and city laws. As the officer approached the car, he detected the odor of marijuana. Defendant was removed from the car and it was searched for marijuana. Officers recovered illegal drugs and a loaded handgun.

On May 31, 2014, officers responded to a report of shots fired in a residence. A neighbor told police he heard shots and then saw defendant exit his residence and put a gun in the trunk of a car. Defendant refused to permit police to search the car, stating that it did not belong to him. The car was towed from defendant's driveway, and during an inventory search police recovered a gun and illegal drugs.

2

A superseding indictment was returned on November 19, 2014, charging the original seven counts and adding the following:

8.     On May 31, 2014, possession with intent to distribute marijuana.

9.     On May 31, 2014, possession with intent to distribute cocaine.

10.    On May 31, 2014, possession of a firearm after having been convicted of a felony.

11.    On May 31, 2014, possession of a firearm in furtherance of a drug trafficking crime.

12.    On February 9, 2013, possession with intent to distribute cocaine.

13.    On February 9, 2013, possession with intent to distribute marijuana.

14.    On February 9, 2013, possession of a firearm in furtherance of a drug trafficking crime.

15.    On February 9, 2013, possession of a firearm after having been convicted of a felony.

Defendant filed the instant motion to suppress on December 21, 2015 (document number 51).  The government filed a response on January 26, 2016 (document number 58), arguing that the February 2, 2012, stop was a lawful Terry stop and the search was lawful pursuant to the automobile exception; the broken taillight was sufficient to justify the stop of defendant on February 9, 2013; defendant has no standing to challenge the search of the car on May 31, 2014; and the search of the vehicle on May 31, 2014, was lawful pursuant to the automobile exception.

On February 12, 2016, I held an evidentiary hearing on defendant's motion to suppress.  The government appeared by Assistant United States Attorney Adam Caine.

3

The defendant was present, represented by Assistant Federal Public Defender Carie Allen. The following witnesses testified:

1.      Officer Adam Duesterhoeft, Kansas City, Missouri, Police Department

2.      Officer Ryan Seeger, Grandview, Missouri, Police Department

3.      Officer Jason Jemison, Kansas City, Missouri, Police Department

In addition, the following exhibits were admitted:

P. Ex. 1        DVD of dashcam

P. Ex. 2        DVD of dashcam

D. Ex. 1        Kansas City, Missouri, Police Department tow policy

A transcript of the hearing was filed on February 17, 2016 (document number 67).

## II.    EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

<u>February 2, 2012</u>

1.      Officer Adam Duesterhoeft worked as a security officer for two years (Tr. at 4). His duties included checking parties coming into an apartment complex, and he often encountered people who smelled of marijuana (Tr. at 4-5). This occurred a couple of times every week (Tr. at 5). In his five years as a police officer, he has encountered marijuana regularly when making traffic stops (Tr. at 5-6). As a result of his experience, Officer Duesterhoeft is familiar with the odor of marijuana (Tr. at 4-5).

2.      On February 2, 2012, Officer Duesterhoeft and Officer Brian Masterson were dispatched to the area of East 77th Terrace on a call of a prowler in the area (Tr.

4

at 6, 14). Specifically, a person wearing a ski mask and dark clothing had been reported in the area of 77th and Brooklyn (Tr. at 6, 15). They responded to the area and circled around looking for anything out of the ordinary (Tr. at 6-7).

3. The officers were driving by an address close to the reported prowler and observed a Buick LeSabre backed into a driveway but close to the street rather than near the house (Tr. at 7). Officer Duesterhoeft shined the spotlight inside and observed two men sitting in the car (Tr. at 7). The car had no lights on; it was approximately 10:30 p.m. (Tr. at 7, 14). The officers decided to conduct a car check to see what the two men were doing (Tr. at 7). Although they could not see whether the men matched the description of the reported prowler, they were sitting in the dark in a car parked face out at the end of a driveway about a block and a half from where the prowler had been reported (Tr. at 7-8, 17). The officers thought it possible that the men in the car were waiting for the prowler, with their car positioned for an easy getaway (Tr. at 8). Officer Duesterhoeft has responded to burglary calls in the past where another individual was acting as a getaway driver (Tr. at 22).

4. The officers pulled the patrol car up near the front of the LeSabre with their emergency lights activated (Tr. at 8). Officer Masterson approached the passenger, and Officer Duesterhoeft approached the driver (Tr. at 8, 9). At this point, the occupants of the LeSabre were not free to leave (Tr. at 21). The LeSabre's windows were rolled up when the officers were approaching the car (Tr. at 8). As the occupants rolled down the windows, Officer Duesterhoeft detected the odor of marijuana coming from the car (Tr. at 9). When they were asked why they were sitting there, the two men gave the officers different stories (Tr. at 9). First one of the

5

occupants stated that the other lived at the residence, but they could not provide the address to the residence (P. Ex. 1, ≈10:45:45). The occupants stated that the girlfriend of the brother of one of the occupants lived at that residence and he was waiting on his brother, and they also stated that a cousin lived there and had asked them to meet him there (P. Ex. 1, ≈10:45).

5. The men in the car did not match the description of the prowler (Tr. at 10). However, the officers obtained the men's identification due to the odor of marijuana coming from the car (Tr. at 10). A neighbor approached Officer Masterson to find out what was going on, and Officer Masterson told her, "They say they're sitting here waiting for your neighbor, they say they know him." (P. Ex. 1, ≈10:48). Officer Masterson said the men in the car did not really match the description of the prowler (P. Ex. 1, ≈10:48). "We don't think they're doing anything, but we just think it's a little weird that they're sitting in the driveway of someone else's house."[1]

6. When a car was coming down the street, one of the men in the car said that was his cousin (P. Ex. 1, ≈10:50:15). However, no one from that car approached the scene and the car left (P. Ex. 1). One of the officers said, "You guys don't have weed in here, do you?" (P. Ex. 1, ≈10:50:27; Tr. at 22-23). The car occupants said they did not.

---

[1]There has been no suggestion that a police officer is obligated to tell a neighbor precisely what illegal activity is being investigated; therefore, the officer's statement to the neighbor that "we don't think they're doing anything" is not evidence that the officers lacked reasonable suspicion to believe that criminal activity (i.e., possession of marijuana) was going on at the time.

6

7.       The passenger of the car had an outstanding warrant, so he was asked to step out of the car and he did (Tr. at 10, 11-12, 13). Officer Masterson told Officer Duesterhoeft to get defendant (the driver) out of the car (Tr. at 11-12).

> Officer Masterson: Why don't you pull him out, take the keys out of the car.
>
> Officer Duesterhoeft: Step out of the car, keep your hands where I can see them.
>
> Defendant: What's going on?
>
> Officer Duesterhoeft: Step out of the car.
>
> Defendant: Why?
>
> Officer Duesterhoeft: Step out of the car, I'm not going to tell you again.
>
> Defendant: Ok. What the fuck did I do?
>
> Officer Duesterhoeft: Turn around, put your hands behind your back.
>
> (inaudible)
>
> Officer Duesterhoeft: This is going to go real easy or real hard.
>
> (inaudible)

At this point, defendant ran from Officer Duesterhoeft (P. Ex. 1, ≈10:52:48; Tr. at 12).

8.       Before defendant ran, he was making Officer Duesterhoeft uncomfortable due to his hesitancy and how nervous he was (Tr. at 12). Defendant was asked to step out of the car because the officers wanted to look inside the car due to the odor of marijuana (Tr. at 13).

9.       Defendant was eventually apprehended and taken into custody (Tr. at 12-13). Officers searched the car and recovered drugs in a backpack (Tr. at 13). They

found marijuana, cocaine, PCP, and a large number of prescription pills (Tr. at 13-14). They also found a magazine in the car (Tr. at 14).

<u>February 9, 2013</u>

10.     In February 2013, Officer Ryan Seeger was in his second month of field training, being trained by a senior officer in the department (Tr. at 24-25). His training while in the academy and during field training included Missouri statutes and the Grandview, Missouri, municipal code (Tr. at 25). On February 9, 2013, Officer Seeger was with his field training officer performing general patrol (Tr. at 25). Officer Seeger was driving the patrol car, and it was his responsibility to decide whether a vehicle was to be pulled over for violating any city or state statutes (Tr. at 26).

11.     While driving southbound on Byars Road, Officer Seeger saw a vehicle in front of him with a white light protruding from the brake light (Tr. at 26-27). The driver's side taillight was broken and had a white light shining through and appeared to be a reverse light (P. Ex. 2, ≈23:24:00 through 23:24:26; Tr. at 27, 34-35). Officer Seeger conducted a traffic stop after the car turned west on to 139th Street from Byars (Tr. at 27).

12.     Officer Seeger was familiar with Grandview Code Section 14-106 and Missouri Revised Statute 307.075 which require cars to have two red lamps in the back that when illuminated are visible from a distance of 500 feet (Tr. at 27-28). He believed the car was in violation of those laws because it had one red light and one white light shining through a broken lamp (Tr. at 28, 31, 34).

13.     Officer Seeger stopped the vehicle, approached the driver, and asked to see his driver's license and insurance card (Tr. at 28). The driver (defendant) could not

8

find the insurance card and said the car was not his but that he was aware the taillight had an issue (Tr. at 28, 29).

14.     Officer Seeger detected an odor of marijuana emanating from the car (P. Ex. 2, ≈23:37:30, 23:39:00, 23:39:12, 23:41:20, 23:43:49, 23:43:51, 23:45:45; Tr. at 28).  Defendant and the other occupants were asked to step out of the car so that the officers could search the car due to the odor of marijuana (Tr. at 29).  Defendant said he had smoked one marijuana joint right before he left but he had not smoked it in the car, and Officer Seeger said that the smell was pretty "thick" coming from the car (P. Ex. 2, ≈23:40:20).  Another passenger said she had smoked marijuana when she was at home (P. Ex. 2, ≈23:43:51).  During a search of the car, officers recovered marijuana, cocaine, ecstasy pills, and a loaded handgun (Tr. at 29).

15.     Officer Seeger gave defendant a ticket for the broken taillight (Tr. at 30). The ticket was for violating an equipment ordinance, 14-105 (Tr. at 30).  Section 14-105 is a more general defective equipment ordinance whereas 14-106 is specific to the lights -- either section would have been appropriate for the ticket in Officer Seeger's opinion (Tr. at 30).

<u>May 31, 2014</u>

16.     On May 31, 2014, Officer Jason Jemison responded to a report of shots fired at 7806 East 111th Terrace (Tr. at 36).  When the officers arrived on the scene, Shawn Harris who was outside flagged the officers down and said he had heard some gunshots (Tr. at 37, 45).  He had looked out the window and saw a man coming out of the house across the street from his own, put a gun in the trunk of a car, and go back

9

inside the house (Tr. at 37). There was only one car in the driveway (Tr. at 37, 38). Officer Jemison had never had dealings with Mr. Harris before this incident (Tr. at 45).

17.     Officer Jemison walked over to 7806 East 111th Terrace, and defendant came out of that house and identified himself as James Crockett (Tr. at 38). Defendant lives at 7806 East 111th Terrace (Tr. at 43). He asked Officer Jemison why he was here, and Officer Jemison said he had received a report of shots fired (Tr. at 38). Defendant said he had been in the house with someone named CJ, and CJ had pulled out a gun and started shooting (Tr. at 39). Defendant would not let the officers inside the house to investigate that story (Tr. at 39). The officers canvassed the front yard, and they looked at the residence to see if there were any bullet holes (Tr. at 39). The officers did not locate any evidence corroborating defendant's story (Tr. at 39). Defendant appeared to be "casual and calm" while the officers were there (Tr. at 39).

18.     Officer Jemison went back to talk to Mr. Harris (Tr. at 40). Mr. Harris pointed to defendant and said he was the person who had put the gun in the trunk of the car after Mr. Harris had heard the gunshots (Tr. at 40, 46).

19.     Officer Jemison called a robbery detective to get some direction on what to do next (Tr. at 40). The detective told Officer Jemison that defendant was a convicted felon and was not permitted to possess a firearm (Tr. at 40).

20.     Officer Jemison returned to defendant and asked if it would be OK to investigate the report that defendant had put a gun in the trunk of the car; in other words, Officer Jemison wanted permission to look in the car (Tr. at 40-41). Defendant said the officers could not look in the car (Tr. at 41). He said it belonged to his girlfriend

and was not his (Tr. at 41). Defendant said the officers would need to get a search warrant (Tr. at 44).

21.     Officer Jemison called another detective, this one from the violent crimes squad (Tr. at 41). That detective said that because the neighbor had seen defendant put a gun in the trunk of the car, the officers could tow the vehicle and hold it for evidence (Tr. at 41). Because the vehicle was going to be towed, the officers conducted an inventory search to make sure there were no drugs or guns in the vehicle (Tr. at 41-42). Officer Jemison opened the trunk to look for the gun, and he found the gun along with illegal drugs (Tr. at 42, 49).

22.     The car, which had been parked in defendant's driveway, was towed at the direction of the detective who wanted the vehicle held for evidence, not pursuant to a tow policy (Tr. at 42-43, 47, 48).

## III.    FEBRUARY 2, 2012

Defendant argues that police had no probable cause to arrest him or to search the car. On this occasion, Officer Duesterhoeft had asked defendant to get out of the car; and when the officer attempted to handcuff defendant, he ran. Defendant argues that because neither defendant nor his passenger matched the description of the prowler, police had no reasonable suspicion to conduct a Terry stop and therefore were not permitted to detain either man or to conduct a computer check.

## A.    TERRY STOP

Generally, searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable, subject only to a few

11

specifically established and well-delineated exceptions.  United States v. Harris, 747 F.3d 1013, 1016 (8th Cir. 2014) (citing Mincey v. Arizona, 437 U.S. 385, 390 (1978)). One exception, first recognized in Terry v. Ohio, 392 U.S. 1, 30-31 (1968), permits an officer to stop an individual if the officer has a reasonable suspicion that criminal activity may be afoot.

The totality of the circumstances determines whether officers have reasonable suspicion to justify a stop.  United States v. Sokolow, 490 U.S. 1, 7 (1989). "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." Williams v. Decker, 767 F.3d 734, 739 (8th Cir. 2014) (internal citation omitted); United States v. Carpenter, 462 F.3d 981, 986 (8th Cir. 2006).  A Terry stop typically is justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop.  United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010).

Defendant argues that officers lacked reasonable suspicion because defendant did not fit the description of the reported prowler.  However, the officers did not approach defendant's car because he matched the description of the prowler. Defendant was only a block or so from the location where the prowler had been reported; this was only a few minutes after the prowler had been reported; the car was backed into a driveway not near the house but instead at the end of the driveway right by the street; there were two men in the car but the car was dark despite it being after 10:30 at night; and in Officer Duesterhoeft's experience, it was unusual to see a car backed into the very end of a driveway and he had encountered burglary calls in the

12

past that involved someone besides the prowler waiting in a getaway car. All of these factors combined to create reasonable suspicion that defendant may be involved in the reported prowler activity. Therefore, the officers were permitted to approach defendant's car to question him.

**B.     REMOVAL OF DEFENDANT FROM THE CAR**

Officers must use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the Terry stop. Terry v. Ohio, 392 U.S. 1, 25-31 (1968). A Terry stop may become an arrest, requiring probable cause, "if the stop lasts for an unreasonably long time or if officers use unreasonable force." Id. However, as part of a lawful Terry stop, officers may take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). Law enforcement officers are entitled to conduct an investigation that is reasonably related in scope to the circumstances which justified the interference in the first place; and they may request the driver's license and registration, request that the driver and any passengers step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose. Knowles v. Iowa, 525 U.S. 113 (1998); Maryland v. Wilson, 519 U.S. 408 (1997); Pennsylvania v. Mimms, 434 U.S. 106 (1977); United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing United States

13

v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998) and United States v. White, 81 F.3d 775, 778 (8th Cir. 1996)).

Once officers approached defendant's car and had contact with the occupants, they encountered (1) the odor of marijuana, and (2) inconsistent and implausible explanations from the occupants about why they were present. These factors did not dispel the officers' suspicion -- they intensified it. As a result, the officers were legally permitted to ask defendant and his passenger to exit the vehicle, and Officer Duesterhoeft's attempt to handcuff defendant while the car was being searched was legally permitted as well. See United States v. Ibarra-Sanchez, 199 F.3d 753, 762 (5th Cir. 1999) ("[O]fficers smelled the marihuana as they approached the van and thereby had probable cause to search the van. . . . After the appellants were ordered out of the van, it made no difference to the ultimate result whether they stood by the side of the road or sat handcuffed in police cars; in either situation, the officers would have discovered the marihuana and arrested them.").

## C. SEARCH OF DEFENDANT'S CAR

Police officers may "conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." United States v. Farnell, 701 F.3d 256, 264 (8th Cir. 2012) (quoting United States v. Kennedy, 427 F.3d 1136, 1140-1141 (8th Cir. 2005)). "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

14

In <u>United States v. Davis</u>, 569 F.3d 813, 817 (8th Cir. 2009), the court of appeals held that officers properly searched the interior of the car after the officer smelled the odor of marijuana coming from the car and, during a pat-down search of the driver, discovered a bag of marijuana in his pocket. In <u>United States v. Nheumann</u>, 183 F.3d 753, 756 (8th Cir. 1999), the court held that after officers smelled the odor of marijuana coming from the car, there existed a reasonable probability that marijuana was located inside the vehicle and the officers "had probable cause to search the entire vehicle for illegal drugs." In <u>United States v. Brown</u>, 634 F.3d 435, 438 (8th Cir. 2011), officers detected the odor of marijuana emanating from the vehicle which provided a "reasonable probability marijuana was located inside the vehicle and the officers had probable cause to search the entire vehicle for illegal drugs."

Here, officers detected the odor of marijuana coming from the car when defendant and his passenger rolled down the windows. Defendant has provided no legal authority for the argument that a faint odor of marijuana is any different, legally, from a strong odor of marijuana. Because officers detected the odor of marijuana coming from defendant's car, they had probable cause to search it.

## IV. *FEBRUARY 9, 2013*

Defendant argues that police had no probable cause to stop defendant for a defective brake light because it is not illegal to operate a vehicle with a cracked brake light that emits both red and white light.

15

R.S. Mo. § 307.075.1 states in relevant part as follows:

Every motor vehicle and every motor-drawn vehicle shall be equipped with at least two rear lamps, not less than fifteen inches or more than seventy-two inches above the ground upon which the vehicle stands, which when lighted will exhibit a red light plainly visible from a distance of five hundred feet to the rear.

Grandview Municipal Code Article V, Section 14-106 states:

(1)    All motor vehicles shall be provided with lights as required by sections 307.040 and 307.075, R.S. Mo., as defined by section 307.020 R.S. Mo. . . . (a) Every motor vehicle and motor-drawn vehicle shall be equipped with at least two (2) rear lamps, not less than fifteen (15) inches or more than seventy-two (72) inches above the ground upon which the vehicle stands, which when lighted will exhibit a red light plainly visible from a distance of five hundred (500) feet to the rear.

Any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver. United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001). A traffic stop is considered a seizure for Fourth Amendment purposes. United States v. Guevara, 731 F.3d 824, 828 (8th Cir. 2013); cert. denied, 134 S. Ct. 1346 (2014); United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). In order to justify the seizure, the stop must be supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred. Heien v. North Carolina, 135 S. Ct. 530, 536 (2014); United States v. Guevara, 731 F.3d at 828 (citing United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006)).

In this case, the undisputed evidence establishes that Officer Seeger stopped defendant's car because the taillight was broken and it had a white light shining through which appeared to be a reverse light. The white light shining through in this manner is visible on the dashcam recording (P. Ex. 2, ≈23:24:00 through 23:24:26). As the

16

parties point out, defendant's position has previously been rejected in United States v. Bowers, 2015 WL 4873997 (W. D. Mo. 2015):

> There is only one Missouri case which has discussed Mo. Rev. Stat. § 307.075 as applied to taillight requirements. That case is Kienzle v. Director of Revenue, State of Missouri, 944 S.W. 2d 326 (Mo. App. 1997). Despite this opinion being issued in 1997, it remains relevant because the language of the § 307.075 has not been modified since that time. In discussing § 307.075, the Kienzle Court states in relevant part as follow[s]: "there was evidence that Corporal Hobson was justified in stopping Respondent….. Her vehicle had a broken right taillight, with "white light" shining through, an apparent violation of § 307.075." Id. at 328. While this statement by the Kienzle Court is made during the Court's passing review of the circumstances at issue in the case regarding suspension of a driver's license, it nonetheless clearly shows the Court's belief that a broken taillight with white light shining through is an apparent violation of § 307.075.

Because defendant's car had a broken taillight with a white light shining through -- an apparent violation of R.S. Mo. § 307.075 -- Officer Seeger lawfully stopped defendant's car.

Once Officer Seeger lawfully stopped defendant's car and approached the driver's side window, he detected a "thick" odor of marijuana emanating from the car. For the reasons discussed in Section III.C. above, the search of defendant's car at that point was proper.

## VI.    MAY 31, 2014

Defendant argues that the search of his car on May 31, 2014, was not a lawful inventory search because the car was not towed in accordance with the Kansas City, Missouri, Police Department's tow policy since the car was parked in defendant's own driveway and the search was conducted solely for investigatory reasons. The government argues that defendant has no standing to challenge the search of the car

17

because he denied it was his, and that even if he does have standing, officers had probable cause to search the car.

To challenge the constitutionality of a search, defendant has the burden of establishing that he possessed a legitimate expectation of privacy in the particular area searched. Rawlings v. Kentucky, 448 U.S. 98, 104-105 (198); Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978). Fourth Amendment rights may not be vicariously asserted. Alderman v. United States, 394 U.S. 165, 174 (1969). In order to show a legitimate expectation of privacy in the area searched, the person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990); Rakas v. Illinois, 439 U.S. at 130-131 n.1; United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995). To determine whether a person has standing to challenge a search, courts consider factors such as ownership, possession or control of the area searched, historical use of the property, the ability to regulate access, the totality of the circumstances surrounding the search, any subjective anticipation of privacy, and the objective reasonableness of the expectation of privacy considering the specific facts of the case. United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

In United States v. Spencer, 2012 WL 6778520, (D. Minnesota, December 14, 2012), the district court found that the defendant had no legitimate expectation of privacy in a car despite his having had access:

> On the night of August 22, 2012, Defendant rode in Miles Lewis's Pontiac as a passenger when Defendant and Lewis went to a downtown Minneapolis nightclub where they arrived at about 10:30 p.m. At about 2:30 a.m., after they

18

left the club, Lewis gave Defendant the keys to the car and asked him to move the vehicle from one side of a parking lot to another, a distance of only a few hundred feet. After Defendant moved the vehicle across the parking lot, he left the keys in the ignition, exited the vehicle, and had no plans of driving the car later in the evening or driving the car home. Thus, although he states that Lewis permitted him to move the car, Defendant admitted that, at the time the vehicle was searched, he did not own the car, his brief possession and control over the vehicle had ceased, and he could not regulate access to the vehicle because he had no possession of the keys. He provided no testimony that he had any historical use of the property. And he admitted that he never intended to use the vehicle beyond moving it across the parking lot. Thus, his permitted use of the vehicle was temporary, limited, and had concluded by the time it was searched. Accordingly, this Court concludes that Defendant did not have a reasonable expectation of privacy in the Pontiac, and therefore he cannot challenge the search of that vehicle as a violation of his Fourth Amendment rights.

See also United States v. Duong, 336 F. Supp. 2d 967 (D. N. D. 2004) (defendant did not claim ownership interest in vehicle, nor did she acknowledge that she was a driver or passenger in the vehicle; therefore, no legitimate expectation of privacy); United States v. Payne, 119 F.3d 637, 641-642 (8th Cir. 1997) (defendant did no more than sit in a car outside auto repair shop, he presented no evidence that indicated he had ever possessed the car or had driven it; therefore, no legitimate expectation of privacy).

In this case, defendant has presented no evidence to satisfy his burden of establishing a legitimate expectation of privacy in the car. Officer Jemison testified that defendant said the car belonged to his girlfriend. There is no evidence that defendant had done anything other than put something in the trunk, and this was a statement made by a neighbor. As in the cases cited above, this alleged involvement with his girlfriend's car is insufficient to establish a legitimate expectation of privacy in the car.

19

The fact that the car was parked in defendant's driveway does not change the result. In <u>United States v. Gomez</u>, 276 F.3d 694, 696-697 (5th Cir. 2001),[2] the court was presented with the issue of whether a defendant had a legitimate expectation of privacy in a vehicle owned by someone else but parked in the defendant's driveway. In a narrowly-drafted opinion, the court of appeals found that the defendant had a legitimate expectation of privacy in the vehicle, "but only because the evidence seized not only was in a truck parked on his property, but also was known to him because it was the subject of the unlawful enterprise in which he took part. We do not speculate on whether there would be standing in any other situation in which these factors were not present." I have found no other case suggesting that defendant would have a legitimate expectation of privacy in a vehicle for no other reason than it was parked in his driveway.

Because defendant had no legitimate expectation of privacy in the vehicle that was searched, his motion to suppress the evidence seized during that search should be denied.

## VI.    CONCLUSION

Based on all of the above, I find that the stops and searches that occurred on February 2, 2012, February 9, 2013, and May 31, 2014, were lawful. Therefore, it is

---

[2]Gomez was charged with conspiracy, possession with intent to distribute, and maintaining a place for the purposes of possession and distribution of marijuana. Police recovered marijuana from boxes found inside a van parked in Gomez's driveway. Gomez had told police that the van belonged to his cousin, and that a man named "Ben" had the keys.

20

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.


/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 24, 2016